and Ms. Velazquez will hear from you first. Good morning, your honors. May it please the court, Elsie Ramos Velazquez on behalf of the petitioner, Beatriz Nguyen-Cheng Anagho. The issue here is whether the Board of Immigration Appeals abuses discretion when it determined that Ms. Anagho did not demonstrate a material change in country conditions to warrant reopening under the time limit and number limit exception under the regulations. We determined that she did meet those exceptions and the reason why is because the country condition evidence submitted by Ms. Anagho is material and it is relevant to the current conditions in Cameroon. The evidence submitted demonstrates that it was not available back during her initial proceedings in the early 2000s. When Ms. Anagho submitted her motion to the government, the government makes the argument that this evidence is just incremental and not material and what do you do about that argument? Your honor, we disagree with that argument and the reason is because while there have been political protests and political opponents have been arrested, detained, and that did happen the early 2000s when Ms. Anagho applied for asylum, we now see an increase and a complete change in how the Cameroonian government is handling protesters, specifically those from the Anglophone region. Under the current conditions, starting in late 2016 and in early 2017, we see a complete change in the Cameroonian government's attacks on the Anglophone regions which are in the northwest and southwest regions of Cameroon. Now that those Anglophone regions are under complete military control, we're seeing armed between government forces and the separatist groups that are located in those regions. Civilians are being attacked. The president of Cameroon has even designated all Anglophones to be considered a threat to the Cameroonian government. This is completely different than what we saw in the early 2000s where SCNC supporters and advocates and protesters who were moving forward to try and separate from Cameroon were arrested. They were detained but they were usually released after a few days or a few hours without any charges. We do see back in the early 2000s where individuals were also tortured while in detention, but we don't see the armed conflict that we see now and what is happening currently in Cameroon where the government forces are going into these Anglophone regions and attacking not only the separatist groups but also civilians. And for that reason, we do see and we do believe that this is a something that has just over time progressed. It started in late 2016 and it developed in early 2017 and it completely erupted between 2017 and 2019 into a full-on armed conflict between Cameroonian government forces and separatist groups in the Anglophone regions. Council, can I follow up on something you just said? It seems to me we got one issue when we categorized the claim of your client that there's persecution on account of her participation in the group SCNC, the separatist group, and we have this issue that Judge Boyd talked about. You know, there was stuff before, there's maybe more severe. Did the board abuse its discretion in terms of the change of country conditions? I have that issue kind of on the one hand, but your client also said that there was persecution on account of being an Anglophone in addition to being an SCNC separatist and it didn't look like you briefed that argument to us. There was no discussion of the board erring by not addressing the Anglophone group. Was there a reason? Is there something about that argument that is less compelling? I was surprised. I just wondered about that issue and didn't see it in the briefs. No, your honor. And when we look at the NCNC current conditions, NCNC is advocating for a secession of the Anglophone regions. So when we look at what's going on with NCNC, we think about also the Anglophone regions. And so they're combined. And so now what we're seeing is that when country reports are addressing the current conditions in Cameroon, they're using Anglophone, the Anglophone crisis. That's how they're addressing it. But when we read those reports... Could you repeat what you just said? The Anglophone crisis. Okay. And specifically when we think of the Anglophone crisis, we immediately think of the NCNC. Because in the late 1990s, early 2000s, NCNC was the organization that was moving for the separation. They were advocating for Anglophones. And so we didn't present a separate argument for Anglophones because we believe it's included in our NCNC argument. And we see that when we look at country reports. We see the mention of the NCNC moving forward and trying to create their own country apart from Cameroon. And for that reason now, Anglophones are being included in that group with them. And the government is prosecuting and is persecuting not only NCNC members, but the entire region as a whole. And Anglophones are seen to be associated with these separatist groups that are moving for separation from Cameroon. And we see that in not just only the Department of State reports, but we see it in the expert reports submitted by Dr. Walker-Saeed. We also see that in the Human Rights Watch report. There are several articles from Human Rights Watch that have gone on and have demonstrated that this isn't just a rise of political prosecution or political persecution. Where protesters and advocates are being arrested and detained. We're now seeing individuals being arrested, detained. We're seeing villages burned down, homes burned down, and armed conflict. Live ammunition being used against demonstrators and protesters. This is much more than just arresting a protester for demonstrating for an illegal organization. This is an armed conflict that is being moved forward by the Cameroonian government. Completely different than the conditions that we saw in the late 1990s and early 2000s. And for that reason is why we believe that there have been a material change in circumstances and that these new reports are relevant to demonstrate that this inaugural does warrant reopening because of these conditions. And when we look at the case from the Fourth Circuit, Wenrong Lin versus Holder, we look at that case and in that case that was a Chinese family planning case. And the court there established that there were no country condition changes that warranted reopening. But the reason why is because the evidence was not relevant. The evidence had been previously submitted. Also, there was evidence that was not authenticated. And there was evidence that didn't even apply to the circumstances of the petitioner. That's completely the opposite of what is going on in Ms. Sinalgo's case. All of the evidence that we submitted with the motion to reopen directly relates to the conditions in Cameroon and how she is impacted not only as an SCNC member, but as an individual who identifies as an Anglophone. Well, if we accept your argument, shouldn't the BIA in the first instance get an opportunity to reconsider, again, those factors you just outlined? Yes, Your Honor. You're not asking us to make the decision? No, Your Honor. We're requesting for the case to be remanded in order for the country conditions to be properly considered to allow Ms. Sinalgo to seek asylum. We're not asking the court to grant Ms. Sinalgo asylum. We're asking her to give her the opportunity to provide her claim for asylum based on these changed country conditions, because they have drastically changed since she applied in the early 2000s. Well, did the board make any initial determination as to whether Sinalgo established a prima facie case for eligibility for asylum? The board didn't reach that conclusion. The board did address... Did or did not? Did not. The board did address the previous adverse credibility claim, but took her current statements under the current motion to reopen as true, that she's a member of SCNC, and that she identifies as Anglophone. And based on that, the next step was to determine, are there changed country conditions? And that's where the analysis ended. The board held that the conditions didn't change, that there was just an incremental change. But we disagree, because what we saw in the early 2000s was country condition evidence that demonstrated this was just a political movement, political protesters and advocates were being targeted, they were being harmed. But now that's... This is now a larger scale force. How long do we keep doing this? Can she come back in 20 years and say there's another change and try to reopen? I mean, when was the order issued in this, 2007, 2009? In 2008, she was issued an order of removal. She did appeal that to the Board of Immigration Appeals. Her appeal was dismissed. A few years later, she filed a motion to reopen based on completely different facts, that she was eligible for adjustment of status. So isn't there a statute of limitations in this? No, Your Honor. There's... The regulation provides... No, forget the regulation. I'm focusing on the statute. What does the statute say? So the statute indicates that there are time limitations and number limitations. Right. However, if there are changed country conditions that are material and relevant, an individual can present a motion to reopen based on those country conditions. It's an exception that's listed in the statute. Just for number, isn't it? It's for time limits and time limit limitations. In the statute? In the limits, yes. It's under INA 240C7C2. While there is no... It indicates there is no time limit on filing of a motion to reopen if the basis of the motion to reopen is to apply for relief under Section 1158 of this title, and it is based on changed country conditions arising in the country of nationality. What's... And what's the number? Is there a limit on the number? There is a limit you can apply. Normally, when you file a motion to reopen, it must be... I'll tell you what I'm getting at, is the statute does not address, does not make an exception. I don't have that before me, and the Fifth Circuit noted that. The regulation does make an exception, and it gratuitously adds one of them, which is not provided in the statute. The Fifth Circuit says that's inconsistent with the statute, and I was going to ask you what your thoughts on that were. So when it comes to... This is the D.J. case on the Fifth Circuit. Thank you, Your Honor. When... Yes, the statute addresses time number limitations. It doesn't address how many motions to reopen an individual can file, and so because it leaves it open, we believe that if the country conditions change in 20 years, and she now has a claim for asylum, Ms. Anago should be allowed to seek reopening of her removal proceedings to apply for asylum, and then the board... Is there an exception to the two-petition limit? No, there is no exception, Your Honor. There are no... You filed your two petitions. Why isn't that now barred? And the reason is because this individual is seeking asylum, and so because she's seeking asylum, there are exceptions to the statute, in the statute, because an individual who's seeking asylum is fleeing persecution, and because of that application for asylum... Well, I'm sorry. I'm not getting my question across. If I understand the statute, it makes an exception for either the time limit or the number, but not both, whereas the regulation makes an exception for both. Do you understand what I'm saying? Yes, I understand, Your Honor. Okay. Now, my question is, do you have any exception? I don't know whether it's the time limit or the number under the statute, where it doesn't provide an exception. Not at the moment, Your Honor, and I can definitely supply that in additional regulations. Ms. Anago's first motion to reopen was not based on asylum. This second motion to reopen is based on changed country conditions that developed in late 2016 and increased in early 2017, and by 2019, when she applied for... When she submitted her motion to reopen, based on these country conditions, there was a full-on armed conflict that warrants... And this is why her case warrants reopening, because she is seeking asylum based on these conditions. The current... The conditions that were in place in early 2000s are completely different to what we see now. There has been an increase. There's an... Like I mentioned before, now we see an armed conflict. These are new facts as to what's going on in Cameroon at the moment when it comes to NCNC members and advocates. And for that reason, it's why we believe that this case should be remanded to allow a board and the immigration judge to review and determine if Ms. Anago is eligible for asylum based on these changes. And we see that in all of the reports that were submitted with Ms. Anago's claim. In the initial filing, when Ms. Anago applied for asylum, most of the country condition evidence did address the human rights concerns that were going on in Cameroon, where people were being arrested, they were being detained. But what we see now, and while, yes, the current conditions also mention protesters being arrested and being detained, we also see how the Cameroonian government and security forces have taken action towards SCNC members and Anglophones. It's a complete rise and a complete change as to what we saw before. And it's understandable that in the early 2000s, SCNC was seen as an illegal organization and the activity was seen as unlawful and illegal and individuals were arrested. But now people are not only being killed, they're being tortured, they're being detained. All Anglophones have to go through checkpoints. These regions are now under military control. Completely different. Your point, I understand your point, but right there you said they're just being arrested. There was evidence of arrest and even torture and detention before. I think your point is that whatever there was before, it's escalated significantly to the point that it's changed conditions. But at least from my view of the record, it seemed like it would be hard to say that in the early 2000s, there weren't allegations of torture or wrongful detention. You're correct, Your Honor. Yes, there were in the early 2000s, arrests, torture, detainment. But we also see in the record where SCNC members that were arrested, a majority of those were released after a few hours or after a few days. And while we do see numbers of individuals who were tortured, detained, of course there are reports of individuals being killed, we don't see the numbers that we see now. The numbers are now staggering where we're seeing hundreds and thousands of individuals being arrested, disappearing. We see the rape and sexual abuse of individuals in these regions. We're seeing anglophones being taken out of their homes, their homes being burned to the ground. It's a complete change as to what was being done by the government security forces in the early 2000s to what the government is doing now. It's a complete attack on these regions. And for that reason, we do ask that the court allow and grant Ms. Anago's petition for review and remand to the lower courts. I want to return to my more technical question, and I understand your argument, but I'm looking at 1229A-C-7. And it says, an alien may file one motion to reopen proceedings under this section, except that this limitation shall not apply so as to prevent the filing of one motion to reopen described in subparagraph C-4. And C-4 talks about battered spouses, children, and parents. So there is no exception to the one petition. And you're now filing your second petition to reopen. Yes, we are filing our second. And so the question is, how can you get around the statute that says you can only file one? Well, we believe that the statute, when we read the statute for a motion to reopen under INA 240-C-7-C, it indicates that if there is a change in country conditions... That's a deadline. That's under the deadline. That's a different section altogether. And it says there that a motion to reopen has to be filed in 90 days. And it has to be filed in 90 days, except with respect to country conditions. Yes. That's under C. But I'm looking under A. It says, an alien will file one motion to reopen. And there are no exceptions except for battered spouses, children, and parents. Well, we do understand that that's what it indicates in the statute. But we also believe that the regulations provide us additional support in order for us to file a second motion to reopen. And the reason is because... Well, how can the regulation say that if the statute says one? These are the regulations that have... The 5th Circuit concluded that they couldn't. I mean, the 5th Circuit said you can't get two petitions. You don't get two cracks. The statute gives you one crack to reopen. And there's no exceptions applicable here. Yes, Your Honor. I understand what the statute says, and I understand what the 5th Circuit says. We don't have that here in the 4th Circuit. And so our... Well, it's not in the 4th Circuit. The question is, how do we read an exception in this statute which says one motion to reopen is allowed? And you've already used that one a time back. This is your second motion to reopen. Yes. We believe that Ms. Inago is permitted to seek a second motion to reopen because this motion to reopen is based on asylum, specifically changed country conditions. And because there isn't anything in... Do you read that in the statute anywhere? We read that in the regulations. And while that is not in the statute, we believe that the regulations allow for Ms. Inago to seek a second motion to reopen because it's not under that regulation. She's not limited by time or by numbers. Why? Because there has... If she can demonstrate a material change in country conditions, she can... Well, I understand that. That gets you out of the 90-day limitation in C. There's a deadline. It says deadlines, 90 days. And it says an exception of this changed country conditions. But there's another limitation in A, which says you only get to file one. And there's no exception to that, the top of one. Okay. You basically have no answer to the statute, do you? Well, at this time, Your Honor, we don't see any decisions from the Fourth Circuit that address this issue. And I could provide additional briefing for that if you would like. All right. Thank you. Thank you, Your Honor. Okay. We'll hear Ms. Krusek. Thank you, Your Honor. Good morning. May it please the court, Sonia Sarge-Krusek, on behalf of the United States Attorney General. Judge Niemeyer, to your point about the statute, I'll dive right in there. You are correct that the statute only provides for an exception to the time limit for the filing of the motion to reopen, whereas the regulations read in both an exception to the time and the number of limitations. The board here did not address that question and did not make its decision based upon that inconsistency. And so it would be really up to the board, I believe, to decide that, to deny the petition on those grounds in the first instance. Otherwise, on the merits, the court should deny the petition for review because the board did not abuse its discretion in denying the motion to reopen. The petitioner in her motion failed to establish a change in country conditions between the time she first applied for asylum, which was in the aughts, and 2019 when she filed her motion. Notwithstanding that the petitioner to present a meaningful comparison between the two situations, the two bodies of evidence that she submitted, the board did engage in such a comparison looking at both sets of evidence and provided a rational and reasonable explanation for its decision. Counsel, let's assume I agree with you that the board did that with respect to members of SC&C or the separatist group. The board doesn't seem to have addressed in any reasoned way the claim about change of conditions related to anglophones generally. It identifies that as a separate group. It says it doesn't meet, there are no change conditions. It concludes that it doesn't, that they haven't met their burden there, but while there's extensive discussion about the separatists, there's no discussion about the anglophones. Now, to be fair to the board, there's no discussion that I read from the petitioner from the government about that either. It's like that issue is just kind of there and there's no one's talking about it. I asked your colleague that and they said they're kind of considered together. They don't seem to be together to me, but what's the government's position on that? Well, your honor, you know the board did assume on page four of the record that it's accepted for purposes of this motion only that the respondent is an anglophone and is a current those two groups. In terms of the way that the court looked at both sets of evidence, it looked at... But they're different, aren't they? I mean, because one of the things the board says is that well there's been no evidence that the government of Cameroon is aware of this particular petitioner individualized sort of evidence. And I get that. That makes perfect sense to the extent you're making an SC&C claim. It doesn't seem to be relevant at all to or way, way less relevant to a claim as an anglophone generally. Now, I mean, you're an anglophone. You have identifying characteristics. It doesn't matter to have that individual sort of thing. Now, I'm making arguments the petitioner didn't make, but I'm just interested why no one's talking about that. Well, I agree it's a tricky issue because I think there's overlap. Here, as my colleague acknowledged, the board made its decision based solely on a failure to show a change in country conditions. Now, it also discussed this evidence regarding targeting of the petitioner in particular. However, I think there it was trying to make a distinction between the adverse credibility finding regarding the past activities and then the assumption that it was making going forward that we're going to assume for purposes of this motion that the petitioner does not need to overcome the adverse credibility finding as they would if had that not been assumed away. And so what the board looked at and what the evidence showed was targeting of SC&C activists and anglophone activists. And it worked with what it had. And the case that was presented in the motion was that, you know, the case that the petitioner presented in her motion to the board at AR-15 referenced in the aughts a simmering but largely quiet tension between two peoples. And by the way, back then the petitioner also submitted a claim based on anglophone nationality. And here the board did not decide that, you know, she had failed to present a prima facie case, did not decide that issue. And so I think that's where the overlap comes in. Well, let me ask you this. The board can and does look at reports of conditions. And, you know, Washington Post in 2019 talked about 500,000 people have been displaced. The number of people fleeing to Nigeria increased from 7,500 in 2016 to 35,000 in 2019. And then you have these other reports that the way I read them, they say that there's a real change in conditions in Cameroon. Well, Your Honor, again, the petitioner was within its, I'm sorry, the board was within its discretion to find that conditions were bad then and that they were bad now. The petitioner in her motion to reopen did not grapple with the IJ's fact findings that there was, you know, horrific conditions back in the aughts. And it was well within its discretion to look at both sets of evidence. And even though it's not required to, it did the digging into the evidence that the petitioner presented, looked at the IJ's findings and decided that when juxtaposed with the case that the petitioner presented in 2019, if anything, if there was any change, it was nothing more than an incremental change of the same conflict and the same tensions that existed. And that is not an abuse of discretion. For instance, the court looked at page 2054 of the record and saw in the 2006 human rights report evidence of deaths of opposition demonstrators, torture of detainees, etc. And I would also add that in the past several years, you know, circuit courts have been confronted with a few of these cases regarding making the similar case and none of them have decided that there has been a material change, that there was a showing of a material change in conditions, including this court in Tekang, and I can provide that site, as well as the 9th circuit, in which the Tekang case we do cite in our brief, in the 9th circuit, the 5th circuit, and the 10th circuit, I believe, or the 5th circuit, they've all decided that there's been no material change under very similar circumstances, and I can provide those citations in a supplemental letter. Those are all unpublished decisions. If the court has no further questions, the government submits that the petition for review should be denied. Thank you. Thank you, Your Honor. We would like to address the fact that the Board of Immigration Appeals is required to compare the old evidence with the new evidence, and that's what the BIA failed to do. When they were reviewing the old country conditions and comparing that to the new country conditions, there's a focus on the protesters were arrested and detained back then, protesters are being arrested and detained now. That's not the only thing that is occurring in Cameroon. As the Department of State report says, now there's an armed conflict that developed as of late 2016, early 2017. We're seeing death of civilians, disappearances of activists. We're also seeing reports of innocent civilians being killed by security forces in these anglophone regions. We're also seeing the government entering into the anglophone region, looking for SCNC members and targeting individuals, whether or not they identify as parts of NCNC or if they're advocating for the secession of these anglophone regions. The Human Rights Watch report that starts on page 239 of the administrative record also indicates that starting in late 2017, that Cameroonian government used live ammunition against protesters and demonstrators, and that the board conducted the same analysis that you're talking about. And the question is, is this a question of fact, or is this a question of law, or what is our standard of review? Because it seems to me that you look at two country reports and you compare them, and you're making a determination as a factual matter, whether one is simply an incremental increase in the same conditions or is materially different. And they came to the former conclusion. Now, what is our standard for reviewing that? Right, so we need to, when we review a decision for the Board of Immigration Appeals, it's specifically in cases where a petitioner is seeking reopening based on country conditions. The board is required to compare old evidence. I understand, they made the comparison. The question is, what is our standard? They made the comparison and they reached a conclusion. You're challenging that conclusion, and my question is, what is our standard on that? Right, so we need to determine, did the Board of Immigration Appeals abuse their discretion when coming to that determination, when making that comparison? And our argument is that they did. Is it a factual finding? Yes, Your Honor, it is a factual finding. All right, and so we defer extensively to factual findings. We don't substitute our own for those, right? Yes, Your Honor. However, what we see here is that the board didn't review all of the evidence, and it's clear because they're only mentioning specific parts of the record. When you take the record as a whole, it's very clear that the conditions have changed in Cameroon, and that's why we ask for the case to be remanded. Thank you. Thank you. All right, I don't know if you're in the courtroom, but I wanted to just reiterate that we would normally come down now and greet you and thank you for your arguments and welcoming me to the Fourth Circuit. That's our practice, and so because of our protocol, we have to do it now remotely, and so we do thank you for your arguments and wish you well. And when you come back to the Fourth Circuit, I hope we come down and shake your hand and greet you personally. All right, we'll take a short recess.
judges: Paul V. Niemeyer, A. Marvin Quattlebaum Jr., Henry F. Floyd